**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | |
|---|---|
| **GRANGE INSURANCE COMPANY,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **3:23-cv-00145-TES** |
| **MARK MARTIN,** *et al.,* | |
| *Defendants.* | |

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT IN PART**

This insurance coverage dispute arises out of an underlying personal injury action[1] brought by Maria O. Harris against Classic City Clydesdales, LLC ("Classic City"), and Shannon Martin. *See* [Doc. 1-1]. The underlying complaint alleges that while Ms. Harris was employed as a stable hand at Classic City, a family-owned horse farm managed by Shannon and Mark Martin, she sustained an injury negligently caused by a coworker and exacerbated by the actions of Mrs. Martin. *See* [*id.*]. Plaintiff Grange Insurance Company agreed to defend Mrs. Martin and Classic City under a reservation of its rights and then filed this action seeking a declaration that it has no duty to defend

---

[1] *Maria O. Harris v. Classic City Clydesdales, LLC, and Shannon Martin*, No. SUCV2023000321, Superior Court of Oconee County. Filed on October 10, 2023, the underlying complaint asserts four causes of action: negligence and infliction of emotional distress (negligent and intentional) against Shannon Martin and Classic City; and negligence per-se and negligent supervision and training against Classic City. *See* [Doc. 1-1, ¶ 47].

either party. *See* [Doc. 29, pp. 1–3]; *see generally* [Doc. 1]. Having completed limited

discovery, Grange now moves for summary judgment, asking the Court to declare that

it has no duty to defend or indemnify Classic City or Shannon Martin in the underlying

action as a matter of law. *See* [Doc. 29]. For the reasons explained in further detail

below, the Court **GRANTS** Grange's Motion for Summary Judgment [Doc. 29] **in part**,

**DECLARES** that Grange has no duty to defend Classic City or Shannon Martin in the

underlying action, and **DISMISSES** the portion of Grange's case relating to its potential

duty to indemnify because, as explained below, it isn't yet ripe.

<u>**BACKGROUND**</u>

A.    <u>**The Insurance Policy**</u>

At all times relevant to this action, Mark Martin had a farmowner insurance

policy issued by Grange, Policy No. FO 2770483 (the "Policy"), in connection with his

ownership of livestock and specialty animals. *See* [Doc. 1-2]; [Doc. 31-1, M. Martin Decl.,

¶ 7]. Three sections of the Policy are relevant to this Order: the Farm Liability Coverage

Form, the Declarations, and the Farm Employers Liability and Medical Payments

Endorsement ("the Endorsement"). [Doc. 1-2, pp. 1, 5–8, 25–38].

First, after cautioning the reader to review the entire Policy carefully, the

preamble to the Farm Liability Coverage Form defined "you" and "your" as those

words are used throughout the Policy:

> Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties and what is and is not covered.
>
> Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to [Grange Insurance Company].

[*Id.* at p. 25]. The Declarations identified the named insured as "Mark Martin," an "individual" in the business of "livestock/specialty animals." [*Id.* at p. 1].

The Farm Liability Coverage Form generally excluded employees' injuries from coverage, stating that "[t]his insurance does not apply to" most injuries "sustained by . . . [a]ny employee . . . as a result of his or her employment by the 'insured.'" [*Id.* at pp. 25, 28]. The Endorsement filled that gap, providing coverage for accidental injuries to farm employees, and defines who is an "insured" for the purposes of this case:[2]

> **SECTION II—WHO IS AN INSURED**
>
> 1. If this endorsement is made part of a policy containing the Farm Liability Coverage Form, Definition 8. (Section IV) of that Coverage Form does not apply to the insurance afforded under this endorsement.
>
> . . .
>
> 3. With respect to the insurance afforded under this endorsement, the following applies:
>    a. An individual, you are an insured, and, if they are members of your household, your spouse, and your

---

[2] In its Motion, Grange relies on the definition of "insured" found in the Farm Liability Coverage Form to argue that Classic City is not covered by the Policy. *See* [Doc. 29, p. 14]; [Doc. 1-2, p. 35]. However, Defendants point out in their Response that because the Endorsement was "made a part of a policy containing the Farm Liability Coverage Form," the definition of "insured" in "[the Farm Liability] Coverage Form does not apply to the insurance afforded under [the Endorsement]." [Doc. 31, pp. 2, 19]. In its Reply, Grange appears to concede that the Endorsement's definition of "insured" supplants the definition Grange relied upon in its Motion. *See* [Doc. 33, p. 7].

> spouse's relatives who are under the age of 21 are also insureds.
>
> **b.** A partnership or joint venture, you are insured. Your members and partners, and their spouses are also insureds, but only with respect to the conduct of your "farming" operations.
>
> **c.** An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
>
> No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

[*Id.* at p. 7]. The Endorsement's definition of "insured" applies in this case, which

appears to be undisputed. *See supra* note 2. However, in construing the Endorsement's

definition of "insured," this Order also examines the Farm Liability Coverage Form's

definition:

> **8. "Insured"**
>
> **a.** "Insured" means you, and if you are:
>
> **(1)** An individual, "insured" also means the following members of your household:
>
> **(a)** Your relatives;
>
> **(b)** Any other person under the age of 21 who is in the care of any person specified above;
>
> **(2)** A partnership or joint venture, "insured" also means your members and your partners and their spouses, but only with respect to the conduct of your "farmer" operations;
>
> **(3)** An organization other than a partnership or joint venture, "insured" also means:
>
> **(a)** Your executive officers and directors, but only with respect to their duties as your officers and directors; and

> **(b)** Your stockholders, but only with respect to their
> liability as stockholders.
> No person or organization is an insured with respect to the
> conduct of any current or past partnership or joint venture
> that is not shown as a Named Insured in the Declarations.

[Doc. 1-2, p. 35]. The Farm Liability Coverage Form also contained a notice provision:

> **2.  DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT**
> **a.** You must see to it that we are notified as soon as
> practicable of an "occurrence" or an offense which may
> result in a claim. To the extent possible, notice should
> include:
> **(1)** How, when, and where the "occurrence" or offense
> took place;
> **(2)** The names and addresses of any injured persons
> and witnesses; and
> **(3)** The nature and location of any injury or damage
> arising out of the "occurrence" or offense.

[*Id.* at p. 33]; *see* [Doc. 1-2, p. 37 (defining "occurrence")].

**B.    The Underlying Complaint**

In the underlying complaint, Mrs. Harris claims that Classic City's barn manager hired her as a stable hand. [Doc. 1-1, ¶ 11]. Her duties required her to operate equipment including a "Gator," an all-terrain vehicle used for various tasks around the farm. [*Id.* at ¶ 13]. She claims she did not receive any formal training from Classic City or its management on how to operate this machinery. [*Id.* at ¶ 19].

The underlying complaint states that on October 19, 2021, as Ms. Harris and her co-workers, Logan and Emily, were wrapping up their duties for the day, they attempted to start the Gator's engine to store it in the garage, but the engine failed. [*Id.*

at ¶¶ 21, 24]. Logan and Emily decided to use Logan's truck to tow the Gator to the barn garage and instructed Ms. Harris to hold a metal carabiner attached to a tow winch attached to the front of the Gator. [*Id.* at ¶¶ 24–25, 27]. Logan then operated the winch controls, intending to unspool the winch cable, but pressed the wrong button, causing the winch cable to retract. [*Id.* at ¶¶ 28–29]. The cable pulled Ms. Harris's hand into the winch mechanism, injuring Ms. Harris's index and middle fingers. [*Id.* at ¶¶ 29–31]. When Ms. Harris freed her hand from the winch, her fingers were nearly completely severed, "dangling," "barely connected to her hand by a few ligaments and tendons," and bleeding profusely. [*Id.* at ¶¶ 31–32].

The underlying complaint further alleges that following the incident, Logan called 911 for an ambulance, but Mrs. Martin intervened, instructing him to cancel the request. [*Id.* at ¶¶ 33–34]. Mrs. Martin "stated that she didn't think that [Ms.] Harris would agree to pay for the cost of the ambulance service" and told Ms. Harris she would drive her to an urgent care center instead, even though Ms. Harris "responded that her mother would pay for the cost of any ambulance transportation to the hospital." [*Id.* at ¶ 35].

According to the underlying complaint, Mrs. Martin first drove Ms. Harris to her home to change shoes before heading to the hospital. [*Id.* at ¶ 35]. As they were finally leaving for the hospital, an ambulance arrived at the property, and Mrs. Martin allegedly called her husband, instructing him to turn off the lights so that the

ambulance wouldn't know where to go. [*Id.* at ¶ 38]. Ms. Harris further claims that once they arrived at St. Mary's hospital, Mrs. Martin downplayed the severity of her injuries to the medical staff, further delaying treatment. [*Id.* at ¶¶ 39–41].

Ms. Harris underwent surgery to reattach her fingers, but complications led to the partial amputation of her fingers. [*Id.* at ¶¶ 43–44]. She claims to have suffered significant physical and emotional pain, as well as financial burdens due to her medical expenses. [*Id.* at ¶¶ 45–46].

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact[] and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

As to issues for which the non-movant would bear the burden of proof at trial, the movant may either (1) point out an absence of evidence to support the non-movant's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real*

*Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)). If the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings[] and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1438 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

In considering a motion for summary judgment, courts must accept the evidence presented by the non-movant as true and draw all justifiable inferences in its favor. *Liberty Lobby*, 477 U.S. at 255. However, courts are not required to draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001).

## **DISCUSSION**

By issuing the Policy, Grange assumed two "separate and independent

8

obligations"—a duty to defend and a duty to indemnify. *Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997) (citation omitted). Grange seeks a declaration that it has no obligation to discharge those duties as a matter of law because Classic City does not qualify as an "insured" under the Policy and the Martins didn't comply with the Policy's notice provision, which Grange argues is a condition precedent to coverage. [Doc. 29, pp. 1–2, Section C]. Defendants, of course, disagree. *See* [Doc. 31].

Insurance is a matter of contract in Georgia,[3] "and the parties to an insurance policy are bound by its plain and unambiguous terms." *Richards v. Hanover Ins. Co.*, 299 S.E.2d 561, 563 (Ga. 1983). So, the Court looks to the Policy to determine Grange's duties to defend and indemnify. *Loftin v. U.S. Fire Ins. Co.*, 127 S.E.2d 53, 58 (Ga. Ct. App. 1962); *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 618 S.E.2d 673, 677–78 (Ga. Ct. App. 2005) (citation omitted). Generally, an insurer must discharge its duty to defend unless the underlying complaint's allegations unambiguously exclude coverage under the policy. *HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012); *Colony Ins. Co. v. Corrosion Control, Inc.*, 390 F.Supp.2d 1337, 1339 (M.D. Ga. 2005). Put differently, if the underlying complaint asserts even a single claim that triggers an insurer's duty to defend, the insurer is obligated to defend all claims in the

---

[3] It is undisputed that Georgia law governs this dispute.

underlying action.

The Court determines Grange's contractual obligations to Classic City and then to Shannon Martin, in that order, approaching each issue in two steps. *See* Fed. R. Civ. P. 56(a). First, the Court must determine whether any material facts are disputed; and second, the Court must ascertain whether the underlying complaint triggers Grange's duty to defend as a matter of law. *See id.*

## A.    <u>Grange's Noncompliance with Local Rule 56</u>

First, the Court notes that Grange missed the mark under Local Rule 56 by failing to attach to its Motion for Summary Judgment a "separate and concise" statement of undisputed material facts. *See* [Doc. 29, Section B]; LR 56, MDGa. Under Local Rule 56, a party moving for summary judgment "shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record." LR 56, MDGa. The rule also requires the Defendants to attach their own statement of undisputed material facts to its response and to respond "to each of the movant's numbered material facts." *Id.*

These requirements help preserve judicial resources by forcing parties to organize their evidence and focusing the court's attention on any genuinely disputed facts. *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (citations omitted). As noted

above, the movant has the initial burden to show that there is no genuine dispute of material fact, and a "separate and concise" statement of facts assists the Court in determining whether this burden has been met. *Landolfi*, 515 F. App'x 834 (citing *Fitzpatrick*, 2 F.3d at 1115). It also provides the nonmovant with a clear set of facts to challenge, and without such a statement, the nonmovant may be unfairly disadvantaged when responding. *See Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).

In this case, Grange filed its Motion without a separate statement of undisputed material facts. *See* [Doc. 29]. Instead, Grange embedded a list of numbered facts within its brief under the heading "Statement of Facts." [*Id.*, Section B]. This put Defendants in a bit of a pickle, as they were "unsure what they should be responding to," illustrating the importance of these requirements. [Doc. 31, pp. 1–2]. In their Response, Defendants "treat[ed] the 'Statement of Facts' in Plaintiff's Motion for Summary Judgment as the facts to address." [*Id.* at p. 2].

As Defendants noted in their Response, this procedural flaw could be fatal to Grange's Motion. [*Id.* at p. 1 n.1]. Valid local rules "have 'the force of law,'" and failure to follow them could result in denial of a motion. *Hollingsworth v. Perry*, 558 U.S. 183, 191 (2010). On the other hand, the Court has broad discretion to enforce local rules strictly or to relax them and excuse noncompliance. *See Resse*, 527 F.3d at 1272 (noting that the district court had "broad discretion" to "essentially overlook[]" noncompliance

with local rules).

Despite this issue, the Court considers the merits of Grange's Motion for several reasons. First, although Grange failed to provide a separate statement of undisputed material facts, the Motion included a numbered list of material facts largely supported by citations to materials in the record. *See* [Doc. 29, Section B]. In other words, Grange didn't ask the Court to waste its resources organizing the evidence and sifting through the record in search of material facts. *See Reese*, 527 F.3d at 1268. Additionally, Grange's Motion, while flawed, gave Defendants a clear enough view of the target, and this procedural hiccup didn't prevent Defendants from responding adequately. *See Hickson Corp.*, 357 F.3d at 1260 (quoting *Celotex*, 477 U.S. at 323). Importantly, Defendants expressly declined to challenge Grange's Motion for Summary Judgment on this procedural ground, choosing to fight instead on the merits. [Doc. 31, p. 1 n.1]. For those reasons, the Court overlooks this deficiency and construes Section B of Grange's Motion as its statement of undisputed material facts. *See* [Doc. 29, Section B]; LR 56, MDGa.[4]

**B.     Grange's Duty to Defend Classic City**

Grange moves for summary judgment on its duty to defend Classic City on the grounds that "it does not qualify as an insured under the Policy." [Doc. 29, p. 2, Section C.3]. Grange contends that while the Policy covers Mark and Shannon Martin

---

[4] With all that said, the Court notes that paragraph 10 of Plaintiff's Statement of Facts is "not supported by specific citation to particular parts of materials in the record," so the Court did not consider it. [Doc. 29, p. 7, ¶ 10]; LR 56, MDGa.

individually, it does not extend to Classic City, a separate legal entity, and thus any claims related to *its* operations, such as Ms. Harris's injury, fall outside the scope of the Policy's coverage. [*Id.* at pp. 14–15]. Defendants argue that the Endorsement is ambiguous and should be construed in favor of coverage, but they do not dispute any fact material to Classic City's coverage status. *See* [Doc. 31, pp. 16–20]. Thus, the only question is whether Grange is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Under Georgia law, "[t]he interpretation of an insurance policy is subject to the relevant general rules of contract construction, the cardinal rule being to determine and carry out the intent of the parties." *Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n-Risk Mgmt. Fund*, 818 S.E.2d 250, 253 (Ga. 2018) (citation omitted); *see* O.C.G.A. §§ 13-2-2, -3. In determining that intent, courts are "to consider the insurance policy as a whole," and construe the contract to "give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage." *Nat'l Cas. Co.*, 818 S.E.2d at 253 (citation omitted). Contract construction involves three steps: (1) if "the language is clear and unambiguous," "the court simply enforces the contract according to its clear terms"; (2) "if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity"; and (3) "if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties

intended must be resolved by a jury." *City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (Ga. 2013) (citation omitted); *see* O.C.G.A. § 13-2-1. The meaning of a "plain and unambiguous" policy is a question of law "and is 'particularly appropriate for summary [judgment].'" *Sims v. Taylor*, 270 F. App'x 940, 944 (11th Cir. 2008) (quoting *Garvin v. Smith*, 510 S.E.2d 863, 864 (Ga. Ct. App. 1999)); O.C.G.A. § 13-2-1.

The Endorsement clearly and unambiguously provides coverage for the Martins and their employees, but it reflects no intent whatsoever to cover Classic City. [Doc. 1-2, p. 7]; *City of Baldwin*, 743 S.E.2d at 389 (citation omitted). Again, the Endorsement states that:

> 3.  With respect to the insurance afforded under this endorsement, the following applies:
> 
>   a.  An *individual*, *you* are an insured, and, if they are members of your household, *your spouse*, and *your spouse's relatives who are under the age of 21* are also insureds.
> 
>   b.  A partnership or joint venture, you are insured. Your members and partners, and their spouses are also insureds, but only with respect to the conduct of your "farming" operations.
> 
>   c.  An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
> 
> No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

[Doc. 1-2, p. 7 (emphasis added)]. Reading the Policy as a whole, it is clear that "you" in

the Policy means Mark Martin, as the Farm Liability Coverage Form conspicuously states at the top of the first page that "[t]hroughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations," and the Declarations clearly identify the named insured as "Mark Martin"—an "individual" in the business of "livestock/specialty animals." [*Id.* at pp. 1, 35]. Thus, it is "clear and unambiguous" that Mark Martin is an insured as an individual, and Shannon Martin is also an insured because she is a member of his household. [*Id.* at p. 7]. Classic City, on the other hand, is not the named insured, nor does it qualify as an "insured" under the Endorsement's plain language. *See* [*id.* at pp. 1, 7]. Because the Endorsement is not ambiguous, the Court must enforce the Policy "according to its clear terms." *City of Baldwin*, 743 S.E.2d at 389 (citation omitted).

Defendants argue that the Endorsement's definition of "insured" is ambiguous and "led Mr. Martin to believe that the Policy provided insurance coverage for both himself and Classic City." [Doc. 31, p. 19–20]. Specifically, they compare the definitions in the Endorsement and Farm Liability Coverage Form and claim that the Endorsement's omission of two phrases[5] creates an ambiguity. [*Id.* at p. 19]. As a result, they contend that the Endorsement "lends itself to a reasonable expectation that the

---

[5] Specifically, Defendants argue that Endorsement omitted "the language of '"Insured" means you, and if you are: . . .'" and "[t]here is no limiting statement in this provision of the Endorsement stating that the 'Insured' means only the Named Insured." [Doc. 31, p. 19].

Policy covers Mr. Martin as an individual, and covers any partnership, joint venture, or organization he may have." [*Id.*].

Courts should read the policy "as a layman would read it" and construe exclusions strictly "against the insurer and in favor of coverage." *Nat'l Cas. Co.*, 818 S.E.2d at 254 (citation omitted); *see Gulf Ins. Co. v. Mathis*, 358 S.E.2d 850, 851 (Ga. Ct. App. 1987). "[I]t is the understanding of the average policyholder which is to be accepted as a court's guide to the meaning of words, with the help of the established rule that ambiguities and uncertainties are to be resolved against the insurance company." *Fid. Nat'l Title Ins. Co. v. Keyingham Inv., LLC*, 702 S.E.2d 851, 853 (2010) (citations omitted). However, the Court finds the Policy plainly unambiguous, and "the rule of liberal construction . . . cannot be used to create an ambiguity where none, in fact, exists." *State Farm Mut. Auto Ins. Co. v. Staton*, 685 S.E.2d 263, 266 (2009). When no such ambiguity exists, "[n]o construction is required or even permissible." *Nguyen v. Lumbermans Mut. Cas. Co.*, 583 S.E.2d 220, 223 (Ga. Ct. App. 2003) (citation omitted).

Now, even assuming for the sake of argument that the Endorsement contains some ambiguity, it is easily resolved by "apply[ing] the rules of contract construction." *City of Baldwin*, 743 S.E.2d at 389 (citation omitted). Considering the Endorsement's language in the context of the Policy as a whole (and as explained above), nothing in the Endorsement changes the fact that "you" in "you are insured" means Mark Martin, individually. [Doc. 1-2, p. 7]. Defendants have not argued otherwise, nor have they

16

identified any portion of the Policy that uses "you" to refer to anything or anyone but Mark Martin. *See* [Doc. 31]. The Endorsement's grammar and structure also confirm that the Endorsement has only one plausible meaning.

Grammatically, each section begins with an introductory appositive phrase, set off by a comma, which specifies the category of named insured to which the section applies. *See* O.C.G.A. § 13-2-2(6); Bryan A. Garner, *The Chicago Manual of Style* § 6.53 (17th ed. 2017); *see also* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 1.5(d) (4th ed. 2018). Each section introduces its subject with a phrase: "[a]n individual," "[a] partnership or joint venture," and "[a]n organization other than a partnership or joint venture." [Doc. 1-2, p. 7]. These phrases function as appositives, as they identify or describe the entity referred to as "you." *See Garner*, *Redbook* § 11.7(a).

The introductory phrases do not define "you"; instead, they function conditionally by identifying the category of named insured to which the main clause applies. In other words, the main clause—"you are insured . . ."—is only valid if the named insured matches the legal entity—*e.g.*, individual, joint venture, etc.—identified by the introductory appositive phrase. [Doc. 1-2, pp. 7, 35]. This is clear for two reasons. First, as already explained, the Policy explicitly states that "[t]hroughout [the Policy] the words 'you' and 'your' refer to the Named Insured shown in the Declarations," and the Declarations identify the named insured as Mark Martin. [*Id.* at pp. 1, 25]. Second, each phrase must be read as nonrestrictive because it "is set off from its referent" (here,

"you") by a comma. [*Id.* at p. 7]. As a nonrestrictive appositive, each phrase "merely provides additional information about its referent without exclusively identifying it," and this does not overcome the presumption that "you" means what the Policy says it means—Mark Martin as an individual. *See Garner*, *Redbook* § 11.7(a). Since these introductory phrases do not redefine "you," and because "you" can only align and agree with one of these introductory phrases at a time, these introductory phrases function conditionally, specifying the category of named insured to which the section applies.

Structurally, the Endorsement mirrors the section of the Farm Liability Coverage Form that it replaced. It clearly delineates that the first section applies if the named insured is an individual, the second if it is a partnership or joint venture, and the third if it is some other organization. *See* [Doc. 1-2, p. 35]. A reasonable individual policyholder wouldn't expect section 3(c) to drastically extend the Policy's coverage to any "organization other than a partnership or joint venture [owned by the named insured]." [*Id.* at p. 7]. Instead, having read the first page of the Policy, the reasonable policy holder would know that he's insured as an individual, and he would understand from the Endorsement's language, context, structure, and purpose that only section 3(a) applies to him. [*Id.*].

To the extent that Defendants argue that Mark Martin intended for the Policy to cover Classic City, that argument is unavailing. When parties enter a contract with

different intentions, "the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning," but only if the contract is ambiguous. O.C.G.A. § 13-2-4; *Smith v. Freeport Kaolin Co.*, 687 F.Supp. 1550, 1557 (M.D. Ga. 1988) (quoting *Lovable Co. v. Honeywell, Inc.*, 431 F.2d 668, 675 (5th Cir. 1970)). No evidence in the record suggests that Grange knew of Mr. Martin's intentions or the meaning he placed on the Policy, and even if it did, this Court's finding that the Policy is unambiguous renders Mark Martin's private understanding irrelevant. *See* O.C.G.A. § 13-2-4.[6]

Because the Endorsement is "clear and unambiguous," the Court will "simply enforce[] the contract according to its clear terms." *City of Baldwin*, 743 S.E.2d at 389 (citation omitted). Defendants' preferred reading of the Endorsement would radically extend the Policy's coverage, but more importantly, is unsupported by the clear and unambiguous language of the Policy. *See* [Doc. 1-2, p. 7].

The Court finds that there is no ambiguity in the Policy to resolve, but to the extent that Defendants' argument holds water, no "ambiguity remains after applying the rules of construction." *City of Baldwin*, 743 S.E.2d at 389 (citation omitted); *see* O.C.G.A. § 13-2-1. Thus, the Court finds that Classic City is not covered by the

---

[6] Of course, Mr. Martin received a copy of the Policy and he had a more than ample opportunity to read over the Policy to confirm that it covered exactly who he wanted the Policy to cover. *See Cotton States Mut. Ins. Co. v. Coleman*, 530 S.E.2d 229, 231 (Ga. Ct. App. 2000) ("An insured who can read is required to read the policy and is presumed to have understood its contents.") (citation omitted).

Endorsement, **GRANTS** Grange's Motion for Summary Judgment [Doc. 29] **in part**, and

**DECLARES** that Grange has no duty to defend Classic City in the underlying action.

## C.     <u>Grange's Duty to Defend Shannon Martin</u>

Next, Grange seeks a declaration that it owes no duty to defend Mrs. Martin (or

any party for that matter) because the Martins didn't comply with the Policy's notice

provision, which Grange claims is a condition precedent to coverage. [Doc. 29, pp. 9–

14]. Defendants object to Grange's reliance on evidence extrinsic to the Policy and

underlying complaint to establish that the notice provision was not performed and

argue that, if the Court does consider that evidence, whether the delay was reasonably

justified is a question of fact fit for a jury. [Doc. 31, pp. 4 n.3, 6–7, 11–13]. As explained

further below, the Court finds that the undisputed facts in this case show that the delay

was unreasonable as a matter of law, so this issue is a question of law appropriate for

disposition on summary judgment. *See Canadyne-Georgia Corp. v. Continental Ins. Co.*, 999

F.2d 1547, 1555 (11th Cir. 1993) (citation omitted).

### 1.     No Disputed Material Facts

The Policy's notice provision required any insured to notify Grange "as soon as

practicable of [an accident] which may result in a claim." [Doc. 1-2, p. 33]. On the same

page, the Policy contained a "full compliance" provision stating that "[n]o person or

organization has a right . . . [t]o sue [Grange] on this Coverage Form unless all of its

terms have been fully complied with." [*Id.*]. Grange argues that the notice provision is a

condition precedent, and the Court agrees. Under settled Georgia law, this "general provision that no action will lie against the insurer unless the insured has fully complied with the terms of the policy will suffice to create a condition precedent." *Progressive Mountain Ins. Co. v. Bishop*, 790 S.E.2d 91, 94 (Ga. Ct. App. 2016) (collecting cases). Further, it is well established that "a notice provision in an insurance contract that is 'expressly made a condition precedent to coverage is valid and must be complied with, absent a showing of justification.'" *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 780 S.E.2d 501, 509 (Ga. Ct. App. 2015) (citation omitted). "The ordinary principle of contract law, that a party seeking to recover under a contract must perform any applicable condition precedent before the contract becomes absolute and obligatory upon the other party, applies to contracts of insurance." *Id.* "[A] forfeiture of insurance coverage may result when an insured fails to satisfy a condition precedent to coverage under the contract," even if that fact is not alleged in underlying the complaint. *Id.*

Thus, the notice requirement in this case was a condition on—not an exclusion from—coverage, and Mrs. Martin cannot obtain coverage under the Policy without showing that she complied with it or can justify her failing to do so. *See Bishop*, 790 S.E.2d at 94.[7] While seemingly harsh, it's far from uncommon. Georgia courts have

---

[7] Defendants also argue that Grange cannot be relieved of its duty to defend unless it can show prejudice. Here, because the Court finds that the notice provision "is a valid condition precedent to coverage, an insurer is not required to show actual harm from a delay in notice in order to justify a denial of coverage based on such failure of a condition precedent." *Plantation Pipe Line*, 780 S.E.2d at 509–510; *Southeastern Express Sys. v. S. Guar. Ins. Co.*, 482 S.E.2d 433 (Ga. Ct. App. 1997).

examined many insurance contracts containing the exact notification language present

in the Policy and have found that the purpose of such a notice requirement is

"obvious":

> to enable the insurer to begin immediately an investigation of the facts and circumstances for determining whether liability might be present and whether a settlement of the claim should be attempted; to get the facts while they [are] fresh and available in the minds of the parties and such witnesses as might be available; to obtain pictures, diagrams, etc. which might assist in showing how the occurrence happened and the extent of any physical damage done. We all know that these matters have a way of disappearing and simply becoming unavailable with the passage of time, and often witnesses may disappear by moving away, or the status of damaged property may be changed within very short periods of time.

*Bituminous Cas. Corp. v. J.B. Forrest & Sons, Inc.*, 209 S.E.2d 6, 8–9 (Ga. Ct. App. 1974).

In determining whether either Martin satisfied the notice provision, the Court

may consider all admissible evidence in the record, contrary to Defendants' assertions

otherwise. *See Allstate Ins. Co. v. Airport Mini Mall*, 265 F.Supp.3d 1356, 1376–83 (N.D.

Ga. 2017); Fed. R. Civ. P. 56(c)(1)(A). Grange argues, based on "the Responses of Mark

and Shannon Martin to Plaintiff's Requests for Admissions,"[8] that it is undisputed that

Grange did not receive notice of the events giving rise to the underlying action until

---

[8] Grange states that a copy of "the Responses of Defendants Mark and Shannon Martin to Plaintiff's Requests for Admissions" are "attached . . . as Exhibit A to" Grange's Motion for Summary Judgment, but Grange filed its Motion with no attachments. [Doc. 29, p. 2]. Defendants pointed that out in their Response, and Grange filed its exhibits with its Reply. *See* [Doc. 32]. Defendants did not file a surreply or request the Court's leave to do so. *See* LR 7.3.1, MDGa.

nearly two years after they occurred. [Doc. 29, p. 2]. Defendants challenge Grange's use of evidence extrinsic to the Policy and underlying complaint, "insist[ing] that this Court may consider only the underlying complaint and Policy when determining whether Plaintiff has a duty to defend." [Doc. 31, pp. 4 n.3, 6–7 (citing *Airport Mini Mall*, 265 F.Supp.3d at 1366)].

Specifically, Defendants object to any evidence regarding "purported facts outside the Policy and four corners of the Underlying Complaint" and "insist that this Court may consider only the Underlying Complaint and Policy when determining whether [Grange] has a duty to defend." [*Id.* at p. 4 n.3].[9] However, courts in the Eleventh Circuit—including the Northern District of Georgia in *Airport Mini Mall*—routinely consider evidence extrinsic to those documents, and the Court has found no authority to support Defendants' restrictive position. *See* 265 F.Supp.3d at 1376.

Defendants misread *Airport Mini Mall* by focusing on its first holding, which dealt with a policy's scope of coverage. *See* [Doc. 31, p. 6]. In that case, the Northern District of Georgia granted summary judgment for an insurer because that policy did not cover the underlying claim, and the insured unreasonably delayed providing notice. *See* 265 F.Supp.3d 1356. To be sure, the court "examin[ed] the allegations of the

---

[9] The Court did not consider several of Defendants' responses to Grange's Requests for Admissions—numbers 3, 4, 5, 6, 7, 8, and 23—because the requests exceeded the scope of discovery permitted by the Court's Scheduling and Discovery Order. [Doc. 32-1, pp. 3–7, 18]; *see* [Doc. 26, p. 3].

[underlying] complaint in conjunction with the relevant policy language" to decide that the complaint asserted no claims covered by the policy. *Id.* at 1366–76. Defendants rely on this first holding, but Grange isn't arguing that the underlying complaint doesn't assert a covered claim, so that issue isn't relevant here.[10] *See id.*; [Doc. 31, p. 6].

Defendants overlook the second, more on-point holding in *Airport Mini Mall*. *See* 265 F.Supp.3d at 1376–83. After finding that the underlying claim fell outside the scope of coverage, the Northern District of Georgia addressed whether the insured's seven-month delay was unreasonable as a matter of law. *See id.* In making that determination, the court considered far more than just the policy and the underlying complaint—it also considered testimony from the insured's property manager, two cease-and-desist letters, admissions in the underlying lawsuit, a federal and local law enforcement raid, and the timing of the insured's notification to the insurer. *See id.* Similarly, in this case, Grange argues that it has no duty to defend *any* claim due to a delay in notice, making the second issue in *Airport Mini Mall*—not the first—directly relevant. *See* [Doc. 33, p. 2]. Thus, in resolving this issue, the Court clearly may consider any admissible evidence in the record. *See Airport Mini Mall*, 265 F.Supp.3d at 1376–83; Fed. R. Civ. P. 56(c)(1)(A).

### 2.    Grange is Entitled to Judgment as a Matter of Law

---

[10] Defendants also rely on *Penn-America*, which is equally inapposite. *See* [Doc. 31, pp. 6–7 (citing, 481 S.E.2d 850)]. Like the portion of *Airport Mini Mall* they reference, *Penn-America* does not address the issue presented in this case: the nonperformance of a condition precedent. *See Penn-Am.*, 481 S.E.2d 850; *Airport Mini Mall*, 255 F.Supp.3d 1356.

In most cases, the timeliness of notice and the corresponding issue of the

sufficiency of an insured's justification for a delay are factual issues that preclude

summary judgment; however, when the undisputed facts show that the delay was

unreasonable as a matter of law, the issue becomes a question of law appropriate for

disposition on summary judgment. *See Canadyne*, 999 F.2d at 1555 (citation omitted);

*Auto-Owners Ins. Co. v. Bailey*, 378 F.Supp.3d 1213, 1222 (M.D. Ga. 2019); *Owens v.*

*Progressive Premier Ins. Co. of Ill.*, 878 S.E.2d 101, 103 (Ga. Ct. App. 2022) (citation

omitted); *Forshee v. Emp'rs Mut. Cas. Co.*, 711 S.E.2d 28, 31 (Ga. Ct. App. 2011) (citation

omitted); *Four Parcels*, 941 F.2d at 1438. Stated differently, if the allegations in the

underlying complaint show that Defendants' justification for their delay is

unreasonable as a matter of law, then there is no triable question of fact. *See Forshee*, 711

S.E.2d at 31 (citation omitted); *Canadyne*, 999 F.2d at 1555 (11th Cir. 1993) (citation

omitted). Because Classic City is not an insured under the Policy, the only issue to be

decided is whether Mrs. Martin provided timely notice.

The allegations against Mrs. Martin in the underlying complaint leave no room

to doubt that the delay in notifying Grange was unreasonable as a matter of law. *See*

[Doc. 1-1]. An insured's "duty to provide notice to the insurer is triggered when the

insured actually knew or should have known of the possibility that it might be held

liable for the occurrence in question." *S.C. Ins. Co. v. Coody*, 957 F.Supp. 234, 237 (M.D.

Ga. 1997). Georgia law "requires an insured 'to act reasonably under the

circumstances,'" but it does not require an insured "'to foresee every possible claim, no matter how remote,' that might arise from an event and give notice of it to his insurer." *Forshee*, 711 S.E.2d at 31 (citation omitted). Whether an insured was justified in not notifying its insurer of an event is determined by considering "the nature and circumstances of 'the accident' or 'the incident' and the immediate conclusions an ordinarily prudent and reasonable person would draw therefrom." *Id.* (citation omitted). The relevant circumstances include "the nature of the event, the extent to which it would appear to a reasonable person in the circumstances of the insured that injuries or property damage resulted from the event, and the apparent severity of any such injuries or damage." *Id.*

First, what specific event does Grange say it should have been notified about? Grange seems to think that the notice requirement was triggered by Ms. Harris's injury rather than Mrs. Martin's actions. *See* [Doc. 33, p. 4]. Defendants argue that because the underlying complaint alleges "that Mrs. Martin was negligent in driving Ms. Harris to the hospital rather than putting her in an ambulance," the relevant question is whether Mrs. Martin "should have notified Plaintiff of her decision to drive Ms. Harris to the hospital." [Doc. 31, p. 10]. The underlying complaint doesn't allege that Mrs. Martin caused Ms. Harris's hand to be injured by the winch, and Grange fails to explain how an injury to a Classic City employee could trigger the notice requirement since Classic City isn't covered by the Policy. *See* [Doc. 1-1]; [Doc. 33, p. 4]. Defendants have the

better argument on this point. *See* [Doc. 31, p. 10].

The key question, then, is whether Mrs. Martin should have notified Grange of her alleged actions? *See Coody*, 957 F.Supp. at 237. She should have. Based on the allegations of the underlying complaint, any reasonable person in Mrs. Martin's shoes would have known that taking control of the situation, including preventing trained EMTs with an ambulance from providing professional and immediate aid and effectively delaying the treatment of Ms. Harris's serious injury, was likely to give rise to a claim under the Policy. *See id.*; *Forshee*, 711 S.E.2d at 31; [Doc. 1-1, ¶¶ 33–38]; [Doc. 1-2, p. 33].

First, Mrs. Martin allegedly delayed the treatment of Ms. Harris's injury, against Ms. Harris's wishes, by preventing an ambulance from responding to the scene of the accident. After Ms. Harris was injured, her "coworker, Emily, immediately telephoned [Mrs.] Martin to report the incident, while Logan telephoned 911 emergency service to request an ambulance, and an ambulance was dispatched to the scene." [Doc. 1-1, ¶ 33]. When Mrs. Martin arrived at the scene, "she became irate and angry that Logan" had called an ambulance because "she didn't think that [Ms. Harris] would agree to pay for the cost of the ambulance," she "directed Logan to immediately call back" and cancel his request even though Ms. Harris told her "that her mother would pay for the cost of" the ambulance, and she "told [Ms. Harris] that she would be driving her to an urgent care center." [*Id.* at ¶¶ 34–35]. To make matters worse, as Mrs. Martin and Ms. Harris

were leaving the property, Ms. Harris claims that Mrs. Martin saw the ambulance arrive at the property and "contacted Mr. Martin . . . to warn him" and "instruct[] him to turn off all outside lights . . . so the ambulance personnel would not know where to find [Ms. Harris]." [*Id.* at ¶ 38].

Mrs. Martin knew or should have known that Ms. Harris was severely injured and that a delay in treatment could likely make the injury worse. According to Ms. Harris's underlying complaint, her "fingers were severed, dangling[,] and barely connected to her hand by a few ligaments and tendons" when Mrs. Martin arrived at the scene. [*Id.* at ¶ 31, 36–37]. Mrs. Martin also told Ms. Harris that "she would be driving her to an urgent care center," which suggests that she knew the injury was severe enough to require professional attention. [*Id.* at ¶ 35]. Thus, considering "the nature and circumstances of 'the accident' . . . and the immediate conclusions an ordinarily prudent and reasonable person would draw therefrom," Mrs. Martin should have immediately known that her actions were likely to give rise to a claim under the Policy, especially once she learned that Ms. Harris lost parts of two fingers. *See Coody*, 957 F.Supp. at 237; *Forshee*, 711 S.E.2d at 31 (citation omitted).

In cases like this one, where notice is a condition precedent to coverage, Georgia courts have held delays of four months to one year to preclude recovery as a matter of law. *See, e.g., Cotton States Mut. Ins. Co. v. Int'l Surplus Lines Ins. Co.*, 652 F.Supp. 851, 856 ("The Georgia courts have repeatedly held that where no valid excuse exists, failure to

give written notice for periods in the range of four to eight months is unreasonable as a matter of law."); *EVI Equip., Inc. v. Northern Ins. Co.*, 188 Ga. App. 818 (1988) (eleven-month delay); *Bituminous*, 209 S.E.2d 6 (four-month delay).

First, relying on *Newberry v. Cotton States Mutual Insurance Company*, Defendants ask the Court to excuse their late notice because the Martins believed that the incident was covered by workers' compensation. [Doc. 31, p. 16 (citing 531 S.E.2d 362, 363–64 (Ga. Ct. App. 2000)]. In *Newberry*, an insured got into a fight at his wife's out-of-state Christmas party but failed to notify his homeowner's insurance until after his sparring partner filed suit 11 months later. *Newberry*, 531 S.E.2d at 362–63. The Georgia Court of Appeals reversed the trial court's grant of summary judgment to the insurer because the insured believed that any claim would be handled through worker's compensation and stated that he "had no idea that his homeowner's insurance policy might afford coverage for an intentional tort that occurred at an office Christmas party hundreds of miles from his house." *Id.* at 364.

The facts of this case are easily distinguishable from those in *Newberry*. *See id.* Here, the undisputed evidence shows that Ms. Harris was injured on the Martins' farm, not on a property in a different state, and that Mr. Martin attempted to contact his insurance agent to report Ms. Harris's injury soon after it happened, demonstrating an awareness that the accident might implicate the Policy. *See* [Doc. 33, p. 5]; [Doc. 31-1, M. Martin Decl., ¶ 3]. Moreover, other Georgia courts have held that an insured's belief

29

that an incident will be covered by other insurance, including worker's compensation, does not excuse an insured's failure to notify an insurer. *See, e.g., Geico General Insurance Company v. Breffle*, 844 S.E.2d 179, 181 (Ga. Ct. App. 2020) (noting that where a policy required notice "as soon as possible after an accident," it would be "contrary to the obvious intent of the policy" to "allow an insured to delay notifying the insurer for months or even years, so long as the insured thought that other insurance existed to cover the loss."); *Ill. Union Ins. Co. v. NRI Constr.*, 846 F.Supp.2d 1366 (N.D. Ga. 2012); *Cotton States Mut. Ins. Co. v. Hipps*, 481 S.E.2d 876 (Ga. Ct. App. 1997); *Diggs v. Southern Ins. Co.*, 321 S.E.2d 792 (Ga. Ct. App. 1984).

To the extent that Defendants attempt to argue that *Bishop*[11] is analogous to this case, the Court disagrees. *See* [Doc. 31, p. 12]. The Georgia Court of Appeals held that a triable issue of fact precluded summary judgment where an insured delayed notice for 11 months, given the nature of the underinsured motorist coverage—which would only have to pay out if the injuries were sufficiently severe to exhaust the at-fault driver's policy limits—and the nature of the injuries, as evidence suggested that the full extent of those injuries may not have been apparent for some time after the accident. *Bishop*, 79 S.E.2d at 96. Here, by contrast, Ms. Harris's injuries were not latent, and Mrs. Martin should have known that her alleged actions were likely to exacerbate Ms. Harris's

---

[11] Defendants' Response contains a paragraph explaining *Bishop*, 79 S.E.2d 91, but doesn't explain why that case is relevant here. *See* [Doc. 31, p. 12].

injury at the time, triggering the Policy regardless of the injury's later development.

Also, to the extent that any case dealing with an underinsured motorist policy is persuasive in this case, *Bishop* is less like this case than *Lankford v. State Farm Mut. Ins. Co.*, 703 S.E.2d 436 (Ga. Ct. App. 2010). In *Bishop*, the court distinguished *Lankford* on the grounds that the two-year delay in *Lankford* was found unreasonable as a matter of law, as opposed to in *Bishop*, where the insured delayed for "less than 11 months" and "provided notice more than a year *before* undergoing surgery for his injuries." *Bishop*, 79 S.E.2d at 121 (distinguishing *Lankford*, 703 S.E.2d 436). Here, like in *Lankford*, the delay was nearly two years, and Grange was not notified before Ms. Harris underwent surgery for her injury. *See* [Doc. 1-1, ¶ 43]; [Doc. 32-1, p. 5]. Regardless, the Policy in this case is a direct liability policy, not an excess or underinsured policy, so neither of these cases decide this matter. *See* [Doc. 1-2].

Next, Defendants argue that the delay was justified because Shannon Martin believed that Mark Martin had already notified Grange. *See* [Doc. 31, p. 9]. Defendants cite no authority to support this argument, and the Court finds that it is without basis in law or fact. First, Defendants' argument assumes that Shannon Martin was somehow entitled to rely on Mark Martin's representations despite the clear lack of any agency relationship between Mark Martin and Grange. Second, Mr. Martin states that he attempted to notify his insurance agent twice, but even if the agent received those messages, they did not satisfy the notice provision's requirements. [Doc. 31-1, M. Martin

Decl., ¶ 3]; *see* [Doc. 1-2, p. 33].

Mr. Martin states that he called his insurance agent twice and left voicemails both times: first "[w]ithin a couple of days of Ms. Harris's alleged injuries at the property" and second "after Ms. Harris alleged a worker's compensation claim against Classic City." [Doc. 31-1, M. Martin Decl., ¶ 3]. Both times, according to Mr. Martin, he told his insurance agent that he was "calling about an incident" and asked for his call to be returned. [*Id.*]. Despite the notice provision's clear language requiring details about the accident, "injured persons and witnesses," and the injury itself, these messages admittedly did not contain any such information. [*Id.*]; *see* [Doc. 1-2, p. 33]; *Plantation Pipe Line* 780 S.E.2d at 509 (citation omitted) ("Where an insured has not demonstrated justification for failure to give notice according to the terms of the policy, then the insurer is not obligated to provide either a defense or coverage.").

Third, even if the agent had received Mark Martin's messages, and even if those messages had satisfied the notice provision's requirements, "[i]ndependent insurance agents or brokers are generally considered the agent of the insured, not the insurer." *Kay-Lex Co. v. Essex Ins. Co.*, 649 S.E.2d 602, 607 (Ga. Ct. App. 2007) (citation omitted). The Martins failed to offer any evidence of an actual or apparent agency relationship between the agent and Grange, so notice to the agent would be as insufficient as a matter of law as notice to Grange. *See id.*; *Auto-Owners Ins. Co. v. Xytex Tissue Servs., LLC*, 421 F.Supp.3d 1369 (S.D. Ga. 2019) (holding that an insurance policy did not vest

an insurance agent with the apparent authority to receive notice of a claim on behalf of insurer even though the first page of the policy prominently listed the agent's contact information). Thus, any argument that the delay was justified because Mark Martin represented that he had complied with the notice provision fails. *See* [Doc. 31, p. 9].

The Court finds as a matter of law that Defendants offer no sufficient justification for the 23-month delay in this case. *See Forshee*, 711 S.E.2d at 31 (citation omitted). Thus, Defendants failed to provide timely notice to Grange, a condition precedent to Grange's contractual obligations. *See Canadyne*, 999 F.2d at 1555 (citation omitted); *Plantation Pipe Line*, 780 S.E.2d at 509 (citation omitted). Accordingly, the Court **GRANTS** Grange's Motion for Summary Judgment [Doc. 29] **in part** and **DECLARES** that Grange has no duty to defend Shannon Martin in the underlying action.

### D.    <u>Grange's Duty to Indemnify</u>

Finally, Grange persists in seeking summary judgment on its duty to indemnify despite the Court's earlier rulings that this particular issue won't be ripe until "a settlement or judgment in the underlying case creates an 'actual controversy.'" *See* [Doc. 29]; [Doc. 28, p. 4 (citing 28 U.S.C. 2201(a))]. The Court has already plowed this ground not once, but twice—first in the Scheduling and Discovery Order, and again in its Order Denying Grange's Motion for Reconsideration. *See* [Doc. 26]; [Doc. 28]. Because Grange's duty to indemnify still isn't ripe for adjudication, the Court declines Grange's apparent invitation to turn the soil a third time and **DENIES** Grange's Motion for

33

Summary Judgment [Doc. 29] **in part**. However, because Grange's duty to indemnify is not yet ripe, the Court **DISMISSES** that portion of this case **without prejudice**.

### <u>CONCLUSION</u>

Accordingly, because Classic City is not covered by the Policy, and because the delay in providing notice to Grange was unreasonable as a matter of law, the Court **GRANTS** Grange's Motion for Summary Judgment [Doc. 29] **in part** and **DECLARES** that Grange has no duty to defend either party in the underlying action. However, because Grange's duty to indemnify is not yet ripe, the Court **DISMISSES** that portion of this case **without prejudice**. The Clerk is **DIRECTED** to enter Judgment and close the case.

**SO ORDERED**, this 24th day of September, 2024.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**